AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>Victor Michel,<br><br>Defendant(s) | Case No.  2:23-mj-00904-DUTY |

**FILED**
CLERK, U.S. DISTRICT COURT

2/24/2023

CENTRAL DISTRICT OF CALIFORNIA
BY:        MR        DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 24, 2023, in the county of Los Angeles in the Central District of California, the

defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute controlled substances |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Andrew W. Davis, Special Agent, Drug
Enforcement Administration
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  February 24, 2023      _____
*Judge's signature*

City and state:  Los Angeles, California      Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: Rajesh R. Srinivasan

## **AFFIDAVIT**

I, Andrew W. Davis, being duly sworn, declare and state as
follows:

## I.  **INTRODUCTION**

1.    I am a special agent with the Drug Enforcement
Administration ("DEA") and have been so employed since July
2018.  I am currently assigned to the Los Angeles Field Division
Enforcement Group One.  I have completed 16 weeks of training at
the DEA Academy in Quantico, Virginia, which included training
on drug identification, detection, trafficking, and
interdiction; money laundering techniques; asset identification,
seizure, and forfeiture; and techniques used by drug traffickers
to avoid detection by law enforcement officials.  During my time
in Enforcement Group One, I have participated in dozens of drug
investigations involving the manufacture and distribution of
controlled substances.  I have participated in and I am familiar
with investigative techniques involving undercover operations;
physical and electronic surveillance; the use of informants and
cooperating sources; the seizure of drugs and assets; execution
of search warrants; and the making of arrests.  Prior to my
employment with the DEA, I was employed with the United States
Capitol Police as a special agent.  Through my training,
experience, and interaction with more experienced investigators,
I know that persons involved in the illicit distribution of
controlled substances maintain extensive contact with
individuals from whom they receive or to whom they distribute
drugs or firearms.  I know that in order to do this effectively,

these persons maintain continued access to telephone
communication.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.     This affidavit is made in support of a criminal
complaint against VICTOR MICHEL for a violation of 21 U.S.C.
§ 841(a)(1) (possession with intent to distribute controlled
substances).  This affidavit is also made in support of a search
warrant for a black Samsung cellular phone, model # SGH-T399N,
with serial number 368765/06/126607/4 (the "SUBJECT DEVICE 1")
described in Attachment A-1, a white iPhone with a black case
bearing a sticker with the words "iPhone 14 pro case" (the
"SUBJECT DEVICE 2") described in Attachment A-2, the premises
located at 10314 Gridley Road, Santa Fe Springs, California
90670 (the "SUBJECT PREMISES") describe in Attachment A-3, and
the dark gray Mercedes sedan with California license plate
number CL30F13, registered to E.P. (the "SUBJECT VEHICLE")
described in attachment A-4, for the items to be seized
described in Attachment B.

3.     The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrant and does not purport to set forth all of my knowledge of
or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only, all

amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. PROPERTY AND PREMISES TO BE SEARCHED

4.     The property and premises to be searched is the SUBJECT DEVICE 1, SUBJECT DEVICE 2, SUBJECT PREMISES, and SUBJECT VEHICLE, described in Attachments A-1, A-2, A-3, and A-4, which are incorporated herein by reference.

### IV. ITEMS TO BE SEIZED

5.     The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy) (the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

### V.   SUMMARY OF PROBABLE CAUSE

6.     In March 2022, DEA agents served a warrant on MICHEL's residence in Los Angeles, California, and found five firearms, approximately one-half pound of methamphetamine, approximately 25,000 to 30,000 suspected fentanyl pills, and $60,019 in U.S. Currency.  On October 27, 2022, MICHEL sold approximately 2,000 fentanyl pills to a person he believed was a customer but was in fact an undercover agent working for the DEA.  In a recorded video call, MICHEL used his telephone to communicate with the undercover agent to coordinate the deal.  On December 21, 2022, MICHEL met with the undercover agent again for the attempted sale of approximately 40 pounds of methamphetamine and 1 kilogram of fentanyl powder.

7.    On February 24, 2023, law enforcement officers saw MICHEL leave the SUBJECT PREMISES with another male in a car. The officers followed MICHEL to the meet location, where DEA agents saw MICHEL attempt to sell the UC fentanyl pills.  DEA agents arrested MICHEL for possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), and in a search incident to arrest, agents recovered SUBJECT DEVICE 1 from MICHEL's person.

8.    The other male then worked with agents to set up an additional purchase of fentanyl pills from a person later identified as Hector David Valdez.  Valdez drove the SUBJECT VEHICLE to an agreed-upon meeting location.  When DEA agents and other law-enforcement officers attempted to arrest him, Valdez fled in the SUBJECT VEHICLE and returned the SUBJECT PREMISES. After remaining inside the SUBJECT PREMISES for about 20 minutes, Valdez left the SUBJECT PREMISES, and agents arrested him.  In a search incident to arrest, agents recovered SUBJECT DEVICE 2 from Valdez's person.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.    <u>MICHEL IS IDENTIFIED AS A SUSPECT IN DRUG TRAFFICKING</u>

9.    On March 9, 2022, I received a telephone call from Special Agent Jasmin Garcia of the DEA Riverside District Office and Special Agent Brandon Soles of the DEA Kansas City District Office regarding a potential drug stash house in the downtown Los Angeles area.  Agent Soles put me in touch with Detective Brandon Winders of the Kansas City Police Department ("KCPD").

Detective Winders relayed the following information
telephonically to myself and DEA Special Agent Jesus Gamez:

      a.   On March 9, 2022, at approximately 7:45 a.m.,
while conducting regular interdiction duties at a bus station
located at 1101 Troost Avenue, Kansas City, Missouri, Detective
Winders observed a male paying strong attention to a nearby
police officer and his narcotics K9.  Detective Winders later
identified this man as R.G.

      b.   Detective Winders approached R.G. and asked for
consent to search his bag.  R.G. did not consent.  Detective
Winders then asked R.G. if he would consent to a K9 sniff of the
bag, to which R.G. agreed.  The K9 alerted to the presence of
narcotics within the bag.  Based on the K9 alert, Detective
Winders advised R.G. that R.G. could give consent to search the
bag or that Detective Winders would get search warrant
authorization.  At this time, R.G. gave consent to search
the bag.  The search revealed a rectangular brown package
wrapped tightly with clear plastic wrap and the numbers "6 x 6"
written on it.  The package contained suspected fentanyl.  After
finding the controlled substance, Detective Winders placed R.G.
under arrest and read him his Miranda rights.

      c.   During a post arrest interview, R.G. told
Detective Winders that R.H. had packed the bag containing the
suspected fentanyl.

      d.   R.G. said that he lived with R.H. at Apartment
5038 at 448 E. 57th Street, Los Angeles, California (the "Los
Angeles Residence").  R.G. stated that R.H. had a girlfriend

named "Melanie," later identified at the search of the Los Angeles Residence as M.S.M.  R.G. also said that the Los Angeles Residence was rented in the name of R.H.'s cousins, later identified as D.C.  R.G. said that the apartment complex was named the Orsini and that R.G. had recently seen large amount of controlled substances, cash, and firearms in the Los Angeles Residence.  Specifically, R.G. said he saw a Springfield XD pistol and between $50,000 to $80,000 in U.S. currency in the kitchen cupboards.  R.G. provided a photograph of R.H. from his photo albums that matched the photograph on R.H.'s California driver's license, which I obtained from a law enforcement database.

10.  I learned from Torrance Police Department ("TPD") Detective Steve Masone that at approximately 3:20 p.m. on March 9, 2022, Detective Masone spoke with an apartment manager at the Orsini Apartments, who said that R.H. had previously applied for apartment #3106 at the Orsini Apartments in June 2021, but was denied.  The manager told Detective Masone that the registered tenant of the Los Angeles Residence was D.C.

11.  I learned from DEA Special Agent Rob McCain that he searched law enforcement databases and found multiple instances where R.H. had listed a nearly identical name to D.C. as his contact person during the booking process at prior arrests.

12.  At approximately 4:17 p.m. on March 9, 2022, Agent McCain and I spoke with KCPD Detective Winders and R.G. regarding the Los Angeles Residence.  R.G. told us the following:

a.   R.G. described the layout of the apartment as having a kitchen immediately to the left as you enter and two bedrooms on either side of the apartment, with a balcony straight ahead.

b.   R.G. stated that R.H. lived in the room to the right after entering the apartment and that another individual named V.P. (later identified as Victor MICHEL), nicknamed "Ocho," lived in the left bedroom.

c.   R.G. stated that he had recently spoken with an apartment manager at the Orsini apartments to obtain a key.  R.G. said that during this interaction, the apartment manager spoke on speakerphone or FaceTime with the registered tenant of the Los Angeles Residence, whom she referred to as "Alfonso."

d.   R.G. stated that in the kitchen there was a cabinet at the end on the right side that would contain the Springfield XD pistol.  R.G. also said that he believed there were extra handguns in the bedrooms.

13.  At approximately 5:38 p.m., TPD Detective Masone told me that he had obtained a signed state search warrant for the Los Angeles Residence based on the information that DEA agents had provided.

14.  I learned the following information from DEA Special Agent Adam Kerr:

a.   At approximately 5:57 p.m., Agent Kerr sent the warrant electronically to R.M., the Area Portfolio Manager for the Orsini Apartments.  Subsequently, R.M. provided Agent Kerr

with the layout of the residence and California driver's license photograph of D.C.  Additionally, Agent Kerr was given garage access.  Agent Kerr began surveilling the Los Angeles Residence.

> b.   At approximately 6:38 p.m., Agent Kerr observed a thin Hispanic male in gray sweatshirt and shorts exit the Los Angeles Residence.  At this time, Agent Kerr walked by the residence and heard multiple people speaking.

15.  I learned from TPD detectives that, at approximately 6:53 p.m., TPD detectives arrived at the apartment complex and established a perimeter around the Los Angeles Residence and associated parking spaces.

16.   Other DEA agents and I arrived at the Los Angeles Residence at approximately 7:35 p.m.   Agents were dressed in full tactical gear with police badges and markings.

17.  At approximately 7:38 p.m., I saw DEA SA Josh Ramirez knock on the door of the Los Angeles Residence.  After a reasonable amount of time, I unlocked the door using a key that I had obtained from Orsini Apartments Area Portfolio Manager R.M.  Prior to the execution of the search warrant, I had learned from Detective Winders that residents of the apartment were gang-affiliated and carried firearms.  Upon opening the door, agents encountered multiple suspects who did not comply with agents' commands.  I witnessed suspects flee the main area towards the balcony and bedrooms.  TPD Detective Masone, who was located on the street level perimeter of the complex, communicated via radio that subjects were jumping from the

residence balcony.  Officers detained R.H. and MICHEL.  R.H. and
MICHEL were injured during their attempted escape, and they
later received medical attention.  TPD Detective Kevin Crisfield
searched MICHEL and found a driver's license on his person.

18.  Inside the Los Angeles Residence, agents encountered
and detained K.B. in the left bedroom and M.S.M. in the
threshold of the right bedroom.

19.  Shortly after, TPD detectives and DEA agents began a
search of the residence.  DEA Agents and TPD detectives found
five firearms, approximately one-half pound of methamphetamine,
approximately 25,000 to 30,000 suspected fentanyl pills, and
$60,019 in U.S. Currency.  After the search, TPD Detective
Crisfield told me that paperwork bearing MICHEL's name was found
in the bathroom connected to the left bedroom and that MICHEL's
U.S. passport was found in the closet attached to the left
bedroom.  Additionally, R.G.'s U.S. passport was found in the
left bedroom.  A wallet containing R.H.'s California driver's
license was found in the right bedroom.  The locations of the
items matched the information given by R.G. to DEA agents.

20.  The warrant resulted in the seizure of five firearms,
approximately one-half pound of methamphetamine, approximately
25,000 to 30,000 suspected fentanyl pills, and $60,019 in U.S.
Currency.

   **B.   INTELLIGENCE SHOWS MICHEL'S CONTINUED INVOLVEMENT IN
        THE DISTRIBUTION OF NARCOTICS.**

21.  In September 2022, I spoke with Federal Bureau of
Investigation ("FBI") Special Agent Robert Potash regarding a

confidential source (hereinto referred to as the "CS")[1] who was in contact with MICHEL.

22.   Agent Potash advised me that the CS has known MICHEL for multiple years and has participated with him in other drug transactions.  Specifically, the CS advised Agent Potash that, in these previous drug transactions, the CS would put MICHEL in contact with potential drug purchasers.  The CS provided Agent Potash with the telephone number for MICHEL.

23.   Based on information from the CS, Agent Potash told me that MICHEL's current telephone number was 1-323-695-0646 ("MICHEL's phone").  On October 8, 2022, the Carrier sent me records showing that MICHEL's phone was subscribed to "Victor Michel" located at 10211 Pinehurst Avenue, South Gate, California 90280.  A law enforcement database check confirmed this address to be associated with MICHEL.  Based on this information, I concluded that the user of MICHEL's phone was likely MICHEL.

24.   On October 20, 2022, I spoke with the CS and a DEA undercover agent (the "UC").  The CS said that MICHEL was expecting a call regarding a purchase of controlled substances from the UC.

---

[1] Based on my conversations with FBI SA Potash, I know that the CS has multiple control substance felony convictions for possession with intent to distribute between 2006 and 2011, as well as misdemeanors for domestic violence, larceny, trespassing, probation violation, reckless endangerment, assault, and threatening between 2000 and 2019.  At this time, the CS is currently working with the FBI and DEA for judicial consideration, and to this point, the CS has provided information that agents have corroborated with independent evidence and deemed reliable.

25.   On October 24, 2022, the UC text messaged MICHEL at MICHEL's phone.  In response, MICHEL told the UC to use "Facetime" to communicate.  The UC told me that drug traffickers have been requesting FaceTime communications more frequently to avoid being intercepted by law enforcement.  The UC FaceTimed MICHEL at MICHEL's phone.  The UC video recorded the call.  Based on my review of the recording and conversations with the UC, I learned that, during their call,  MICHEL and the UC discussed the following:

a.   The UC asked MICHEL if MICHEL could sell him fentanyl.

b.   MICHEL had access to the "buttons" (fentanyl pills) that the UC asked for.

c.   MICHEL said the price was $2.50 per pill for 2,000 pills.

d.   MICHEL said that he was in the Ontario / Chino Hills area and he would be available on October 26, 2022, for the buy.

26.   On the same day, I conducted law enforcement database checks on vehicles registered to MICHEL.  The following vehicles were registered to MICHEL at 2431 S Garfield Place, Ontario, California (the "Ontario Residence"):

a.   A 2008 Infinity sedan bearing California license plate 6DYJ002 (the "Infinity").

b.   A specially constructed vehicle from the year 2000 bearing California License Plate 4KM9899.

11

27.   I learned from DEA Special Agent Angelica Childs that, at approximately 6:56 p.m. on the same day, she observed the Infinity parked at the Ontario Residence, which corroborated MICHEL's statement about living in the Ontario / Chino Hills area.

28.   I learned the following information from the UC:

a.   On October 26, 2022, at approximately 9:06 a.m., the UC text messaged MICHEL at MICHEL's phone and advised that he would not be available until the following day.  MICHEL responded "Ok no problem it's ready either way."  Based on my knowledge of the investigation, I determined that "it" referred to the fentanyl pills.  Later in the day, MICHEL texted the UC from MICHEL's phone and stated "Ok no problem ima be ready for when you are.  wed/ sundays are my day off from work but any other day I could get to you after 4:30 just wanna let you know."

b.   Later in the evening, MICHEL texted the UC from MICHEL's phone and stated that he worked in the area of the Ontario Mills mall and would be off work at 4:30 p.m.  MICHEL said that he could meet around that time or "could just have my boy meet you."

29.   On October 27, 2022, at approximately 11:15 a.m., the UC, other DEA agents, and I, as well as TPD officers Torrance, met in the area of the Ontario Mills mall for a safety and operational briefing.  At this time, the UC was outfitted with an audio recording device.  The UC was provided with $5,000 for the purchase of approximately 2,000 fentanyl pills.

12

30.   The UC then messaged MICHEL at MICHEL's phone that he was on his way to meet MICHEL.  MICHEL texted the UC from MICHEL's phone and asked to meet at 8030 Monet Avenue, Rancho Cucamonga, California, 91739.

31.   At approximately 11:45 a.m., DEA special agents, aerial surveillance units, and TPD officers established surveillance in the southeast area parking lot area of the Ontario Mills mall.  At approximately 12:00 p.m., DEA Special Agent Lindsay Burns and I escorted the UC from the briefing location to the meeting location.

32.   At approximately 12:16 p.m., the UC messaged MICHEL at MICHEL's phone that he was located near the Sketchers store, to which MICHEL responded "Ima be at sketcher in 9 min."

33.   At approximately 12:24 p.m., the UC received a telephone call from MICHEL's phone.  During the call, MICHEL advised that he was driving a gray Infinity, a description that matched the Infinity.  Moments later, I saw that the Infinity parked adjacent to the UC.  Based on my conversations with the UC and my review of the audio recording, during the meeting, MICHEL advised the UC that MICHEL had access to larger amounts of fentanyl pills and fentanyl powder for future purchase and that the price would be reduced with a larger order.

34.   I learned from TPD Detective Crisfield that at approximately 12:25 p.m., he observed the UC and MICHEL speaking outside their vehicles.  A few minutes later, Detective Crisfield observed MICHEL enter the driver side door of the Infinity as the UC entered the passenger side door of the

13

Infinity while keeping the door open.  A few minutes later, Detective Crisfield observed the UC exiting the passenger side of the Infinity with a white bag in his hands.  Detective Crisfield then saw MICHEL drive away in the Infinity.  MICHEL was immediately followed by DEA aerial surveillance and TPD detectives.  I learned from TPD Detective Masone that, at this time, he confirmed the license plate on the Infinity matched the Infinity registered to MICHEL.

35.  I learned from TPD Detective Masone that TPD officers surveilled the Infinity until the vehicle stopped at McCoy Recycling at 8975 Rochester Avenue, Rancho Cucamonga, California, at approximately 12:39 p.m.  About six minutes later, TPD Detective Masone observed MICHEL speaking on the telephone and walking into McCoy Recycling.  At this time, officers terminated surveillance on MICHEL.

36.  Agent Burns and I escorted the UC back to the briefing location for debrief.  At this time, I took possession of approximately 2,000 fentanyl pills from the UC and transported it back to the Los Angeles Fire Department for processing and safekeeping.  Subsequent to transport, I conducted a presumptive field test on the pills, which was positive for the presence of fentanyl.

### C.   DEA UNDERCOVER ATTEMPTS TO PURCHASE APPROXIMATELY 40 POUNDS OF METHAMPETAMINE AND 1 KILOGRAM OF FENTANYL POWDER ON DECEMBER 21, 2022.

37.  On December 13, 2022, the UC messaged MICHEL on MICHEL's phone and asked him if he was available.  Shortly after the UC Facetimed MICHEL at MICHEL's phone to discuss an upcoming

14

purchase.  I learned the following by viewing the conversation and from the UC:

      a.   During the conversation, I could clearly see MICHEL's face through the camera on MICHEL's phone.

      b.   The UC told MICHEL that he was looking for "cuadra."  Based on my conversation with the UC, who is a native Spanish speaker, I learned that "cuadra" means "block" and that it is coded language to describe kilograms of particular controlled substances, in this case fentanyl.

      c.   The UC asked if the "buttons" (fentanyl pills purchased on October 27, 2022) were made from the same "cuadras" (kilograms) that he was going to buy.  MICHEL responded that he did not believe so because the kilograms of fentanyl powder come from across the border and the pills are usually made "here," which I interpreted to mean the United States.

      d.   The UC asked the price of 25 or 30 pounds of methamphetamine.  MICHEL stated that "guys he works with in Tennessee" purchase the pounds of methamphetamine for "12." Based on my training and experience and my knowledge of this investigation, I believe that "12" is coded language for $1200. MICHEL told the UC that if the UC bought "50," MICHEL can most likely do it for "1" each.  Based on my training and experience and my knowledge of this investigation, I believe that "50" is coded language for 50 pounds and "1" is coded language for $1,000.

e.   MICHEL stated that he needed to check with his "boy" for the price of the kilogram of fentanyl powder and would text it to the UC.

f.   MICHEL asked if the UC had the Telegram app, to which UC responded no.  Based on my training and experience, drug traffickers prefer to use P2P type applications, like Telegram, because they are difficult for law enforcement to intercept.

g.   MICHEL used the term "waters" when referencing the pounds of methamphetamine.

h.   The UC asked if MICHEL would be available on the 20th of December and MICHEL said that he is working, but he had the 21st of December off.

38.   On December 14, 2022, MICHEL text messaged the UC from MICHEL's phone, and they engaged in the following conversation:

MICHEL:  I got one at 18 and another one at 26

UC: ?… same? Why two different? Or two for 26?..

MICHEL:  Different %

MICHEL:  The 26 one you could make 4 outta one cause it's 1000%

UC: What % is the 18

The UC later confirmed to me that "18" meant $18,000 per kilogram and "26" meant $26,000 per kilogram, based on the purity differences.

39.   On December 19 and 20, 2022, MICHEL text messaged the UC.  They had the following conversation:

MICHEL: We can do the solid still

16

UC: What's up my boy…. just to confirm we're good for the 50 for 1 each

MICHEL: There's only 40 available rn can you do 11 to get it going

UC: Can you FT in a bit

MICHEL: After 4:30 i can

UC: Cool What part of LA are will you be at

MICHEL: Whittier/ Santa fe

The UC later confirmed to me that "40" meant 40 pounds of methamphetamine.  Based on my knowledge of the investigation and my training and experience, I understand "FT" to refer to FaceTime.

40.  Later on December 20, 2022, the UC Facetimed with MICHEL on MICHEL's phone.  The UC told me that he and MICHEL negotiated a deal for December 21, 2022, and that MICHEL would sell the UC 40 pounds of methamphetamine for $1,050 a pound and one kilogram of fentanyl powder for $18,000.  MICHEL told the UC that the drug dealing was a family business and they were only comfortable selling that amount for now.

41.  On December 19, 2022, I telephonically appeared before United States Magistrate Judge Maria A. Audero, who signed warrant 2:22-MJ-04957 authorizing the interception of GPS location data on MICHEL's phone.  On December 20, 2022, I began to receive GPS information from MICHEL's phone.

42.  During December 20, 2022, MICHEL's phone was near the Ontario Residence at 2431 S Garfield Place, Ontario, California and McCoy Recycling at 8975 Rochester Avenue, Rancho Cucamonga,

17

California.  McCoy Recycling is the same location that agents followed MICHEL to after the controlled buy on October 27, 2022.

43.  On December 21, 2022, I reviewed the GPS location data from MICHEL's phone, which showed MICHEL's phone to be in the vicinity of 17405 Anastasia Avenue, Fontana, California ("the Anastasia Avenue address").

44.  At approximately 7:30 a.m., DEA agents established surveillance in the vicinity of the Anastasia Avenue address. At approximately 8:02 am, DEA Special Agent Caleb Hodgson observed the Infinity near 17275 Orange Way, Fontana, California.  The Infinity is registered to MICHEL, and MICHEL used it in the October 27, 2022, purchase of approximately 2,000 fentanyl pills.

45.  At approximately 8:54 a.m., MICHEL texted the UC on MICHEL's phone: "I have everything set for 12 you think you'll make it by then?"  The UC responded that he was busy in Bakersfield but would try to make it but might be there closer to 1 or 2 p.m.

46.  At approximately 10:15 a.m., DEA aerial surveillance was established at the Anastasia Avenue address.

47.  At approximately 12:12 p.m., the UC called MICHEL at MICHEL's phone, who did not pick up.  Minutes later, MICHEL called back.  The UC told MICHEL that he was on the way, and MICHEL said that he would be heading out soon to Whittier to meet the UC.

48.  At approximately 12:32 p.m., DEA Special Agent Angelica Childs observed MICHEL exit 17275 Orange Way, Apt A,

Fontana, California along with a female, who was carrying a baby.  MICHEL and the female walked up to the Infinity.  MICHEL entered the Infinity and drove away, and the female walked back toward Apt A.  Law enforcement continued surveilling the Infinity using ground and aerial units.

49.  At approximately 1:07 p.m., the UC texted a Google Maps pin for the location of 12545 Imperial Highway, Norwalk, California to MICHEL's phone and told MICHEL that he could meet him there in 5 or 10 minutes.  MICHEL responded: "I'm 20 min from there on my way."  At approximately 1:36 p.m., MICHEL entered the meeting location and parked near the UC's car.  MICHEL got out of MICHEL's Vehicle and spoke to the UC.  MICHEL asked the UC to follow him to the stash house located at 10308 Gridley Road to pick up the agreed upon controlled substances.  The UC refused and asked him to first go take a picture of the narcotics to prove that the narcotics were indeed there.

50.  Shortly thereafter, MICHEL left the meeting location.  DEA surveillance followed MICHEL to 10314 Gridley Road (the SUBJECT PREMISES).  DEA aerial surveillance observed MICHEL park in front of the SUBJECT PREMISES at approximately 2:03 p.m. and meet with several unidentified individuals.  TPD Detective Masone observed a heavyset male with dreadlocks come from the direction of a Dodge Journey parked on the street and join MICHEL and the others.  The unidentified individuals then went inside of the SUBJECT PREMISES.  MICHEL stayed outside and used his phone for several minutes.  Detective Masone observed another vehicle pull up and park in the vicinity.  An

unidentified individual exited the car, greeted MICHEL, and then entered the SUBJECT PREMISES.  At approximately 2:19 p.m., Detective Masone observed MICHEL enter the SUBJECT PREMISES.

51.  At approximately 2:27 p.m., Detective Masone observed MICHEL get into his vehicle and leave southbound.  DEA aerial surveillance observed that MICHEL did not have anything substantial in his hands.  DEA agents followed MICHEL to an Exxon gas station at 11405 Florence Avenue.  At approximately 2:33 p.m., agents terminated surveillance.

D.   **MICHEL AND DEA UNDERCOVER ATTEMPT TO SET UP A PURCHASE OF FENTANYL PILLS FOR LATE FEBRUARY.**

52.  Starting on January 18, 2023, the UC messaged MICHEL on MICHEL's phone in attempts to conduct another drug transaction.  Between January 18, 2023, and February 1, 2023, the UC and MICHEL had the following conversation over text message:

UC:  Hey, my boy…. I'll be in town once again. If you want to we can still do it.. everything will be different this time

MICHEL:  We could start like we were going before bro and grow the account bigger by time so we both gain each other trust bro i don't want you feeling like last time

MICHEL:  Let's stick to one thing at a time

UC:  Sounds good my boy….what can we start with

MICHEL:  What you came and got the first time g

UC:  Cool…im in the east coast and get back to LA next week….I'm looking for 25…

MICHEL:  Ill be ready

20

UC:  Thank you

MICHEL:  What day you gunna be out here

UC:  Ill be ready on Thursday bro….

Based on my knowledge of the investigation, conversations with the UC, training, and experience, I know that when MICHEL says "What you came and got the first time," he is referring to the fentanyl pills from the October 2022 controlled buy discussed above.  When the UC says that he is "looking for 25," he means 25,000 fentanyl pills.  Ultimately, the deal in early February did not occur, but the UC told MICHEL on MICHEL's phone that he would let him know when he is back in the Los Angeles area.

53.  Starting on February 17, 2023, the UC messaged MICHEL on MICHEL's phone and had the following conversation:

UC: What up my boy…..i get back from Mexico next week….Let's pick up where we left from…can you do Friday for 25?

MICHEL: Lmk let's try talking during the week

UC: What's up my boy…..I'll be in Cali this week and around your area on Friday

MICHEL: That's fine, we good on prices and everything so we could run it smooth?

UC: What is it going to be for the 25?

MICHEL: I could do 2 point off of the last play

(UC and MICHEL have call described below)

MICHEL: Can we settle at 18

UC: 1.80?

MICHEL: Yes

21

UC: I can do that…I'll hit you up tomorrow sometime. Gracias.

MICHEL: Sounds good g

Based on my training, experience, knowledge of the investigation, and conversations with the UC, I know that when the UC says "25", he means 25,000 fentanyl pills.  When MICHEL says "2 point off of the last play," he means 20 cents off the $2.50 per pill paid in the aforementioned deal.  After the phone call, the UC and MICHEL settled on a price of $1.80 a pill.

54.   I reviewed the phone call made during this conversation between MICHEL and the UC.  From my review and conversations with the UC, I know the following about the call:

    a.   The UC confirmed that MICHEL wanted to sell the pills for $2.30 a pill.

    b.   The UC said that was a lot for "25."  Based on my training, experience, and conversations with the UC, I understand that "25" means 25,000 pills.

    c.   MICHEL asks "what's the ticket you're looking for."  Based on my training, experience, and conversations with the UC, I understand that "ticket" means price.

    d.   The UC says that he has 40 racks, which would amount to $1.60 a pill.  Based on my training, experience, and conversations with the UC, I know that a "rack" is $1,000.

    e.   MICHEL tells the UC that he will confirm with his people and send him a text.

55.   On February 23, 2023, the UC texted MICHEL at MICHEL's phone:

UC: What's up my boy….. I'll be heading to you in the morning. Can we meet around 11.. I should be in Ontario around that time

UC: We good?

MICHEL: Yea g, you ok with going to the apt this time ?

MICHEL: So i can count the cash with my boy

UC: No…i dont do thjngs that way…we can meet like last time….amd i can call the money so you can see it…. Then you call your people once you confirm…. And we will meet in thw middle….

MICHEL: That's fine tomorrow I'll give you a address we can meet at tomorrow we'll do like last time, ill be with you so we can do the call to show my people, then theyll bring it down to us

MICHEL: Sounds good ?

UC: Sounds good

### E.   MICHEL ATTEMPTS TO SELL A DEA UC 25,000 FENTANYL PILLS.

56.   I learned from TPD detectives that on February 24, 2023, at approximately 8 a.m., they set up surveillance on MICHEL's location based on GPS location data, which was near the Ontario Residence.  Detectives observed the Infinity parked outside the Ontario Residence.

57.   At approximately 9:30 a.m., TPD detectives observed MICHEL walk out of the direction of the residence with a weighted green backpack and enter the Infinity.  The Infinity left, and TPD detectives followed.

58.   On February 24, 2023, leading up to the planned deal, MICHEL and the UC texted each other confirming that they would meet at 11 a.m.  MICHEL told the UC that the UC needed to be in Whittier to do the deal.  The UC stated that he was already in Ontario, which is where UC previously told MICHEL that they would meet.  MICHEL apologized and stated that he thought the UC wanted to meet in Whittier.  The UC then agreed to drive to Whittier and told MICHEL that the UC would tell him where once the UC gets to the area.

59.   Shortly thereafter, MICHEL told UC that yesterday he told his "boy" noon and that his boy was not ready yet.

60.   At approximately 10:10 a.m., TPD detectives observed MICHEL park at an apartment complex located at 11865 Skylark Circle, Whittier, California 90606 ("Whittier Residence").

61.   Around 11:20 a.m., MICHEL called the UC from MICHEL's phone.  I listened to the call on a recorded line.  MICHEL stated that his boy was not ready yet.  Furthermore, MICHEL stated that he had "10" on him and his boy had the other "15." MICHEL stated that UC could have the "10" now for the same price so that the UC did not have to wait and that next time, they could go up from there.  The UC asked what MICHEL meant when he said that his boy had the "15."  MICHEL stated that his boy had them already but that he was busy right now.  The UC asked if MICHEL's boy could meet around 12, and MICHEL said yes.  MICHEL then said that he bought the "10" from his boy and that he should have just bought the whole thing.

62.  At approximately 11:40 a.m., TPD detectives saw MICHEL in an outdoor stairwell in the Whittier Residence with an unidentified male ("UM1").  UM1 had a bag with him.

63.  At approximately 11:54 p.m., TPD detectives observed MICHEL get into the Infinity as the driver.  TPD detectives observed UM1 enter as the passenger.  The Infinity drove away.

64.  At approximately 12:25 p.m., the Infinity returned to apartment complex.

65.  Around this time, the UC texted MICHEL a meeting location.  The location was a Target parking lot.  Shortly thereafter, the UC called MICHEL.  I listened to the call on a recorded line.  The UC asked about MICHEL's boy and the other "15," and MICHEL stated that his boy would be another hour. MICHEL stated that they could do the "10" for now.  The UC then told MICHEL that he had sent his location to MICHEL, and MICHEL stated that he would come and give an estimated arrival time once he saw the location.  They agreed that the cost would be "18 grand" for the 10,000 pills, and MICHEL stated that he had "it" with him.

66.  At approximately 12:35 p.m., MICHEL texted the UC from MICHEL's phone: "On my way 17 min."

67.  At approximately 12:36 p.m., TPD detectives observed MICHEL get into Infinity as the driver carrying a large bright blue weighted plastic bag.  TPD detectives observed UM1 enter as the passenger of the Infinity.

68.  At approximately 12:50 p.m., TPD detectives observed the Infinity enter the Target store parking lot, the location

25

sent by the UC to MICHEL as the meeting location.  Other DEA
agents and I were surveilling this location.  TPD detectives saw
the Infinity pull into the Jamba Juice parking lot, which was
within the meeting location parking lot.  UM1 exited the
Infinity and walked inside the Jamba Juice.  The Infinity then
proceeded toward the UC's location.  The Infinity drove up and
parked next to UC.  MICHEL exited the Infinity and greeted the
UC, and MICHEL apologized.  The UC asked to see "it," and MICHEL
brought him to the back passenger side door.  The UC saw a blue
bag and opened the bag and saw what appeared to be fentanyl
pills.

69.  At this point, DEA agents arrested MICHEL.  DEA agents
searched the Infinity and found a large bag of blue pills in the
back seat.  DEA agents performed a field test of the fentanyl
pills seized from the Infinity, and the pills tested
presumptively positive for the presence of fentanyl.

70.  A DEA agent also searched MICHEL incident to his
arrest and found SUBJECT DEVICE 1 on MICHEL's person.

71.  TPD detectives observed UM1 watching the arrest,
pacing back and forth operating a cellphone.

**F.  DEA AGENTS ARREST ADDITIONAL PERSON FOR ATTEMPTED
    FENTANYL DEAL.**

72.  At approximately 12:59 p.m., TPD detectives observed
UM1 exit the Jamba Juice while on the phone.  At this point, TPD
detectives detained UM1 and obtained his identity.

73.  TPD Detective Masone spoke to UM1, who volunteered the
following information:  UM1 knew where the other 15,000 fentanyl

pills were and said that he could order them up.  He provided
the drug supplier's phone number.  He also said that the
supplier, whom he called "Hector," had 25,000 pills on him.  He
pulled up the address 10314 Gridley Road, Santa Fe Springs,
California, 90670 (the SUBJECT PREMISES).  He claimed that
Hector drives a brand new dark gray Mercedes sedan.

74.  Shortly thereafter, TPD detectives arrived in the
vicinity of SUBJECT PREMISES and observed a dark gray Mercedes
sedan parked on the curb directly across the street from the
residence with a California license plate of CL30F13 (the
SUBJECT VEHICLE.)

75.  Through FaceTime and text messages, UM1 spoke with
Hector to arrange to pick up additional fentanyl pills.

76.  UM1 told agents that Hector's girlfriend would be
arriving at Cherri's Donuts at 10017 Orr and Day Road, Santa Fe
Springs, California, to pick up UM1 to bring UM1 to Hector's
house, where he would pick up the rest of the fentanyl pills and
give Hector the money the UC had given UM1.  TPD detectives and
DEA agents, including me, set up surveillance in the parking lot
of Cherri's Donuts.

77.  Shortly thereafter, TPD detectives observed a female
arrive in Cherri's Donuts parking lot driving the SUBJECT
VEHICLE and leave shortly thereafter.  TPD detectives followed
the SUBJECT VEHICLE back to SUBJECT PREMISES.

78.  UM1 then spoke to Hector again, and Hector said that
he would bring a sample of pills to UM1 at a Jack-in-the-Box
located at 11442 Telegraph Road, Santa Fe Springs, California

27

90670.  TPD detectives, other DEA agents, and I set up
surveillance in the parking lot of the Jack-in-the-Box.

79.  At around 3:15 p.m., TPD detectives observed a
heavyset Hispanic male who matched UM1's description of Hector
exit the SUBJECT PREMISES and enter the SUBJECT VEHICLE as the
driver.  TPD detectives then observed the SUBJECT VEHICLE drive
to and enter the aforementioned Jack-in-the-Box parking lot.
Around this time, UM1 received a phone call from Hector, and
Hector stated said he was there and asked where UM1 was.

80.  Shortly thereafter, Hector circled the lot in his car,
waited approximately 5 to 10 minutes, then headed south in the
lot.  TPD Detective Masone then drove his undercover vehicle in
front of the SUBJECT VEHICLE, blocking his path.  DEA agents
then drove up behind the SUBJECT VEHICLE and approached the
SUBJECT VEHICLE on foot.  Detective Masone exited his car
wearing his department issued external vest with police patches
and badges. As DEA agents approached the SUBJECT VEHICLE, the
SUBJECT VEHICLE accelerated and hit the driver's door on
Detective Masone's vehicle.  The SUBJECT VEHICLE then drove to
SUBJECT PREMISES, and Hector ran into the house.

81.  TPD detectives began calling Hector out of the house
using their cars' intercom system.  After roughly 20 minutes,
Hector came out of the house.  DEA agents arrested Hector.
Hector's girlfriend then left the house, and DEA agents also
detained her.

82.  A DEA agent searched Hector incident to his arrest and
found a white iPhone with a black case (SUBJECT DEVICE 2).  The

case had a sticker with the words "iPhone 14 Pro card holder" on the inside.  Inside the case, the agent found a driver's license.  The driver's license photograph matched Hector's appearance and stated Hector's full name as "Hector David Valdez."

83.  DEA agents and TPD detectives performed a safety sweep of the SUBJECT PREMISES.

84.  While clearing the target residence for officer safety, I saw a plastic gallon sized bag adjacent to the toilet in the bathroom.  The bag contained powder residue and what appeared to be a few pills.  Based on my training, experience and the time lapse between when Hector Valdez entered the home and when he surrendered to law enforcement, I believe that he flushed controlled substances down the toilet, which is conduct common among drug traffickers to avoid detection by law enforcement.  These observations, however, are unnecessary to establish probable cause for this search warrant and complaint, and I am not relying on them to establish probable cause.

85.  DEA agents froze the SUBJECT PREMISES while awaiting review of the application for a warrant to search it.  A woman named M.F. eventually arrived at the SUBJECT PREMISES, identified herself as Hector Valdez's mother, and claimed to own the SUBJECT PREMISES.  She gave agents permission to search the SUBJECT PREMISES.  Agents chose to await the issuance of a warrant before searching the SUBJECT PREMISES.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

86. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a. Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet. Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time. Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b. Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has

---

[2] As used herein, the term "digital device" includes SUBJECT
DEVICE 1 and SUBJECT DEVICE 2 (collectively, the "SUBJECT
DEVICES") and includes any electronic system or device capable
of storing or processing data in digital form, including central
processing units; desktop, laptop, notebook, and tablet
computers; personal digital assistants; wireless communication
devices, such as paging devices, mobile telephones, and smart
phones; digital cameras; gaming consoles; peripheral
input/output devices, such as keyboards, printers, scanners,
monitors, and drives; related communications devices, such as
modems, routers, cables, and connections; storage media; and
security devices.

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

87. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

e.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

f.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

88.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

32

h.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

i.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MICHEL's or Valdez's thumb and/or fingers on the devices; and (2) hold the devices in front of MICHEL's or Valdez's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

89.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.   CONCLUSION

90.   For all the reasons described above, there is probable cause to believe that Victor MICHEL violated 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances).

91.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits,

and instrumentalities of violations of the Subject Offenses will
be found at or in the SUBJECT DEVICES, SUBJECT PREMISES, and
SUBJECT VEHICLE, as described in Attachments A-1 through A-4.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 24th day of
February 2023.

_____   PVC
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE 1"), which was seized on February 24, 2023, from Victor MICHEL, and is currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, California:

A black Samsung cellular phone, model # SGH-T399N, with serial number 368765/06/126607/4.

## <u>ATTACHMENT A-2</u>

<u>PROPERTY TO BE SEARCHED</u>

The following digital device (the "SUBJECT DEVICE 2"), which was seized on February 24, 2023, from Hector David Valdez, and is currently maintained in the custody of the Drug Enforcement Administration in Los Angeles, California:

A white iPhone with a black case bearing a sticker with the words "iPhone 14 pro case."

**ATTACHMENT A-3**

PREMISES TO BE SEARCHED

The premises located at 10314 Gridley Road, Santa Fe Springs, California 90670 (the "SUBJECT PREMISES"). The SUBJECT PREMISES is a single-family home located at on the eastern side of Gridley Road. The SUBJECT PREMISES's curb is marked with paint with the number "10314" in black letters on a white background. The house is tan in color with a white trim. The house has a wooden door, red brick chimney, and antennae attached to the roof. The property also includes a garage on the southeastern corner of the property that appears to be converted to a living area.

## <u>ATTACHMENT A-4</u>

<u>PROPERTY TO BE SEARCHED</u>

The dark gray Mercedes sedan with California license plate number CL30F13, registered to E.P. (the "SUBJECT VEHICLE").

## ATTACHMENT B

ITEMS TO BE SEIZED

    1.   The items to be seized are fruits, instrumentalities, and evidence of violations of 21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy) (collectively, the "Subject Offenses"), namely:

        a.   Any controlled substance, controlled substance analogue, or listed chemical;

        b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

        c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

        d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

v

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

      e.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

      f.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      g.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

      h.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

Facebook Messenger, Snapchat, FaceTime, Skype, Signal, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.     Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

j.     Contents of any calendar or date book;

k.     GPS coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

l.     Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.     With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.     evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved userna.m.es and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security

software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.  As used herein, the term "digital device" includes any

electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

SEARCH PROCEDURE FOR THE SUBJECT DEVICES

    4.   In searching the SUBJECT DEVICES (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

        a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") may
search any SUBJECT DEVICE capable of being used to facilitate
the above-listed violations or containing data falling within
the scope of the items to be seized.

        b.   The search team will, in its discretion, either
search each SUBJECT DEVICE where it is currently located or
transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

                              ix

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items

x

to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling

xi

outside the scope of the items to be seized absent further order
of the Court.

5.     The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

6.     During the execution of this search warrant, law
enforcement is permitted to (1) depress Victor MICHEL's or
Hector David Valdez's thumb- and/or fingers onto the fingerprint
sensor of the SUBJECT DEVICES (only if the device has such a
sensor), and direct which specific fingers and/or thumbs shall
be depressed; and (2) hold the device in front of Victor
MICHEL's or Hector David Valdez's face with his or her eyes open
to activate the facial-, iris-, or retina-recognition feature,
in order to gain access to the contents of any such device.  In
depressing a person's thumb or finger onto a device and in
holding a device in front of a person's face, law enforcement
may not use excessive force, as defined in Graham v. Connor, 490
U.S. 386 (1989); specifically, law enforcement may use no more
than objectively reasonable force in light of the facts and
circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.